**SOUTHWESTERN BELL TELEPHONE COMPANY, Plaintiff,**

v.

**PUBLIC UTILITY COMMISSION OF TEXAS, Defendant.**

**Civ. No. A–92–CA–270.**

United States District Court, W.D. Texas, Austin Division.

Jan. 15, 1993.

Robert J. Hearon, Jr., no pro hac vice, Michael Diehl, Graves, Doughtery, Hearon & Moody, Austin, TX, for plaintiff.

Steven Baron, Atty. General's Office, Susan D. Bergen, Texas Atty. General's Office, Austin, TX, for defendant.

## ORDER

SPARKS, District Judge.

On May 1, 1992, Southwestern Bell Telephone Company ("SWBT") filed its Original Complaint and Application for Temporary Restraining Order and Preliminary Injunction requesting relief from the application of a new rule enacted by the Public Utility Commission of Texas ("PUC"), which would require SWBT to poll each of its Texas customers to determine if the customer wished to allow SWBT to use customer-specific "customer proprietary network information" ("CPNI")[1] to market supplemental services or release customer-

1. CPNI includes information such as the number of lines a customer has; whether or not he or she has touch-tone or rotary dial; his or her amount of charges; most frequently dialed numbers; and so on.

specific CPNI to third parties.[2] *See* 17 Tex.Reg. 2992–2996 (1992) (codified at 16 Tex.Admin.Code § 23.57(e) (Tex. Public Util. Comm'n). Shortly thereafter, the parties reached an agreement that the PUC would not seek to enforce Rule 23.57 (or "the PUC Rule") pending the outcome of this litigation, obviating the need for immediate action by this Court. SWBT has subsequently filed two motions for summary judgment, to which the PUC has responded, and resolution of which both parties agree will dispose of the case as there are no factual disputes.

## I. BACKGROUND

Southwestern Bell Telephone Company is a public utility local exchange carrier ("LEC"), also known as a Bell operating company ("BOC"), which provides telecommunications services in Texas. SWBT is a wholly-owned subsidiary of Southwestern Bell Corporation ("SBC"). SBC, in turn, is the parent corporation of Southwestern Bell Enterprises, Inc., which is the parent corporation of Southwestern Bell Messaging Services, Inc. ("SMSi"). SMSi is not a subsidiary of SWBT or an LEC or BOC, but it is an affiliate of SWBT, which is currently introducing a new service called CallNotes to SWBT customers in Texas.

The Public Utility Commission of Texas regulates the intrastate utility operations of SWBT, and the Federal Communications Commission ("FCC") regulates interstate utility operations of Southwestern Bell as well as those areas of operation which cannot be described as wholly intrastate or interstate. If a state public utility commission enacts a rule in conflict with an FCC order, an injured party may seek an injunction against enforcement of the state rule. 47 U.S.C. § 401(b) (1991).

It is under Section 401(b) that SWBT has brought this suit against the PUC.

## II. STANDARD OF REVIEW

■ When asked to determine if a person, which includes a state public utility commission, has violated an FCC order, a

district court must accept as valid the FCC order in question. *Southwestern Bell Tel. v. Arkansas Pub. Serv.*, 738 F.2d 901, 905 (8th Cir.1984) *vacated on other grounds*, 476 U.S. 1167, 106 S.Ct. 2885, 90 L.Ed.2d 973 (1986) (federal courts of appeals have "exclusive jurisdiction to 'enjoin, set aside, suspend ..., or determine the validity of all final orders of the [FCC]' "); *City of Peoria v. General Elec. Cablevision Corp.*, 690 F.2d 116, 119 (7th Cir.1982) (same); *see also Mountain States Tel. & Tel. v. Dep't of Pub. Serv.*, 588 F.Supp. 5, 7 (D.Montana 1983) (following *City of Peoria*). This Court's job under Section 401(b) is, thus, simply to ensure compliance with the orders of the FCC as written. Any disputes concerning the validity of any of the FCC's orders must be brought before the Fifth Circuit Court of Appeals. *See* 47 U.S.C. § 402.

Section 401(b) reads, in relevant part:

> If any person fails or neglects to obey any order of the Commission ... the Commission or any party [1] *injured* thereby, ... may apply to the appropriate district court of the United States for the enforcement of such order. If, after hearing, that court determines [2] that the order was *regularly made* and [3] *duly served*, and [4] that the person is in *disobedience* of the same, the court shall enforce obedience to such order by a writ of injunction or other proper process....

47 U.S.C. § 401(b) (emphasis added). The parties have stipulated to the fact that the FCC orders in question were regularly made and duly served upon the PUC. Therefore, the only issues before the Court are whether the PUC disobeyed any FCC orders and, if so, whether SWBT was injured by such disobedience.

## III. FEDERAL PREEMPTION

A. Did the PUC Disobey FCC Orders by Requiring Prior Authorization to Use Customer Specific CPNI?

■ In a series of orders, starting in 1986, the FCC abolished previous require-

---

**2.** Prior to the passage of Rule 23.57, SWBT was merely required to instruct its customers that they had the right to restrict access to their CPNI if they so desired.

ments for structural separation between BOC personnel marketing basic services and BOC personnel marketing customer premises equipment (CPE) (e.g., telephone systems) and enhanced services (e.g., voice mail, E-mail, Westlaw, Lexis, etc.), implementing new nonstructural safeguards instead.[3] The FCC did this in order to promote efficiency and in order to promote expansion of the market for innovative telecommunication products and services. *See Order on Remand*, at 7575, 7610.

> Eliminating all structural separation requirements and allowing the BOCs to provide enhanced services pursuant to nonstructural safeguards will permit the BOCs to realize fully their vast potential to provide enhanced services to the public, *especially* to the *consumer* market. [It] will permit the BOCs to use their extensive resources ... to provide a variety of enhanced services throughout the country. Such an approach will permit the BOCs to *use* existing marketing contacts with *virtually every household* within their regions to market enhanced services to consumers inexpensively, to use the same personnel to repair and install the services and equipment necessary to provide basic and enhanced services, and to use their expertise to engage in research and development for enhanced services.

*Id.* at 7575, para. 6.

> BOC marketing efforts that make consumers more aware of the benefits of enhanced services should expand the market for such services, *benefitting both consumers and* [enhanced service providers] *ESPs.*

*Id.* at 7610, para. 85.

Having determined that expansion of the enhanced services market would benefit both consumers and ESPs, and that integrated marketing could best achieve that purpose, the FCC turned to the question of customer-specific CPNI and prior authorization rules. The FCC concluded that prior authorization rules would require separation of basic and enhanced marketing personnel, defeating the goal of integration of all marketing forces. *Id.* at n. 155; *id.* at 7631, para. 121 n. 246. The FCC further concluded that

> [u]nder a prior authorization rule, a *large majority* of mass market customers are likely to have their *CPNI restricted* through inaction ... Thus, a prior authorization rule would *vitiate* a BOC's ability to achieve *efficiencies* through integrated marketing to smaller customers—one of the benefits sought through adoption of nonstructural safeguards rather than structural separation.

*Id.* at 7610–11, para. 85 n. 155 (emphasis added).

Accordingly, although recognizing the need for narrow preemption, the FCC explicitly preempted most prior authorization rules: "[W]e *preempt* state CPNI rules applicable to the BOCs, AT & T, and independents that require *prior authorization* whenever such authorization is not required by our rules."[4] *Id.* at 7636, para.

---

3. *See In the Matter of Furnishing of Customer Premises Equipment by the Bell Operating Telephone Companies and the Independent Telephone Companies,* CC Docket No. 96–79, Report and Order adopted November 25, 1986 (published at 2 F.C.C.Rcd. 143 (1987)) ("CPE Order"); *In the Matter of Furnishing of Customer Premises Equipment by the Bell Operating Telephone Companies and the Independent Telephone Companies,* CC Docket No. 86–79, Memorandum Opinion and Order on Reconsideration, adopted December 15, 1987 (published at 3 F.C.C.Rcd. 1 (1987)) ("CPE Reconsideration Order"); *In the Matter of Computer III Remand Proceedings: Bell Operating Company Safeguards and Tier 1 Local Exchange Company Safeguards,* CC Docket No. 90–623, Report and Order adopted November 21, 1991 (published at 6 F.C.C.Rcd. 7571 (1991)) ("Order on Remand"); *In the Matter of*

*Filing and Review of Open Network Architecture Plans,* CC Docket No. 88–2, Memorandum Opinion and Order adopted May 1, 1991 (published at 7 F.C.C.Rcd. 2999 (1992)); *In the Matter of Filing and Review of Open Network Architecture Plans,* CC Docket No. 88–2, Memorandum Opinion and Order adopted November 21, 1991 (published at 6 F.C.C.Rcd. 7646) (1991)); *In the Matter of Filing and Review of Open Network Architecture Plans,* CC Docket No. 88–2, Memorandum Opinion and Order adopted April 12, 1990 (published at 5 F.C.C.Rcd. 3103 (1990)); *Computer III Phase II Reconsideration Order,* 3 F.C.C.Rcd. 1150 (1988).

4. FCC rules only require prior authorization to access and use CPNI for those customers with more than twenty lines. *Order on Remand,* at 7598, para. 58, 7613, para. 89.

130 (emphasis added); *see also id.* at 7631, para. 121.

Despite the FCC's explicit preemption of any state prior authorization rule not required by the FCC and specific mention of the PUC's then proposed prior authorization rule,[5] the PUC adopted a slightly modified[6] prior authorization rule on April 24, 1992. *See* 17 Tex.Reg. 2992–2996 (1992) (codified at 16 Tex.Admin.Code § 23.57). Subpart (e) of the PUC Rule (23.57) requires LECs (or BOCs) to obtain written prior authorization before using customer-specific CPNI to market supplemental services or releasing it to third parties, including affiliates of LECs. 16 Tex.Admin.Code § 23.57(e)(1), (2). An LEC may also use customer-specific CPNI, during that call only, if a new residential customer calls to initiate basic services and inquires about supplemental services or if an existing residential customer, who has not given prior written authorization, "contacts the [LEC] to inquire about supplemental services" and gives verbal authorization for the LEC employee to use his or her CPNI at that time. *Id.* § 23.57(e)(5).

The PUC argues Rule 23.57 is not preempted by the FCC's Order on Remand because BOC personnel marketing supplemental services (which include enhanced services and some basic services, but not CPE) are not barred from having *access* to, but merely *use* of, customer-specific CPNI. Thus, because all personnel, whether marketing basic services, enhanced services, or both, will have access to CPNI, integrated marketing will still be possible. In support of its argument that, despite the FCC's plain language, the FCC meant only to preempt state rules requiring prior authorization before BOC personnel could access, not use, CPNI to market enhanced services, the PUC points out the general purpose of the FCC to promote integrated market-

ing and the use of the word "access" in various parts of the FCC orders. For instance, in the same paragraph that the FCC preempts most state prior authorization rules, the word "access" is used three times in sentences stating that access to CPNI is necessary for "effective integrated marketing of enhanced services." *See Order on Remand,* at 7636, para. 130.

Without delving into the merits of the PUC's argument that separation of marketing forces would not result from application of Rule 23.57, it is quite clear to this Court that the FCC said *all* prior authorization rules are preempted. Whether the FCC intended to say, or should have said, only rules requiring prior authorization to access customer-specific CPNI are preempted is a question for the FCC or the Fifth Circuit Court of Appeals, not this Court. Furthermore, in one paragraph, the FCC stated "[u]nder the current CPNI rules for enhanced services, the BOCs' enhanced services marketing personnel are allowed to *make use of* CPNI without customer authorization...." *Id.* at 7605, para. 75. This and earlier references to the benefits of increasing the market for enhanced services and reducing the costs of BOCs marketing enhanced services indicate that the FCC intended to preempt rules restricting use of, as well as access to, customer-specific CPNI. Accordingly, this Court finds the FCC's Order on Remand preempts PUC Rule 23.57 to the extent it requires prior authorization before a BOC can use customer-specific CPNI to market supplemental services.[7]

B. Is SWBT injured as a result of the PUC's disobedience to any FCC Order?

1. *Degree of Injury Required*

■ Section 401(b) also requires that a party bringing suit under its provisions be

---

5. *See Order on Remand,* at 7631, para. 121 n. 246.

6. The new rule allows LEC personnel marketing supplemental services to have access to, but not use of, customer-specific CPNI without prior authorization. *See* 17 Tex.Reg. 2992–2996 (1992).

7. In its answers to interrogatories, the PUC admitted that CPE, customer premises equipment, is not a supplemental service as defined in Rule 23.57. Therefore, prior authorization is not required by the PUC before BOC personnel use customer-specific CPNI to market CPE, and a finding of preemption with respect to CPE is unwarranted and unnecessary.

"injured." SWBT need not, however, prove irreparable injury as required in a traditional suit for injunctive relief. *See South Cent. Bell Tel. Co. v. Louisiana Pub. Serv. Comm'n,* 744 F.2d 1107, 1120 (5th Cir.1984), *vacated and remanded on other grounds,* 476 U.S. 1166, 106 S.Ct. 2884, 90 L.Ed.2d 972 (1986); *Illinois Bell Tel. Co. v. Illinois Commerce Comm'n,* 740 F.2d 566, 571 (7th Cir.1984); *Southwestern Bell,* 738 F.2d at 908 n. 15.

The PUC nonetheless argues that "substantial" injury is necessary in order for injunctive relief to issue under Section 401(b). In support, the PUC cites several cases in which courts found violations of FCC orders had caused plaintiffs to sustain significant economic injuries. *See e.g., South Cent. Bell,* 744 F.2d at 1113 (rate of return reduced from 13.5% to 12%); *Illinois Bell,* 740 F.2d at 571 ($95,000.00 lost each day); *Southwestern Bell,* 738 F.2d at 908 n. 15 ($11,256,223.00 in annual revenues lost). None of these courts, however, says anything about the need for the injury suffered to be substantial. *See id.* The plain language of the statute simply says "injured," and this Court believes the fact that the amounts of injuries suffered in the above cases were large was due to the nature and size of telephone companies and not a reflection of the legal need for an injury to be substantial. This Court will, therefore, proceed to determine whether or not SWBT was injured, substantially or otherwise, by the PUC's violation of any FCC order.

### 2. *Existence of Injury*

■ SWBT maintains it will incur three types of injury if Rule 23.57 is enforced: (1) risk of fines due to the impossibility of complying with both FCC and PUC regulations; (2) compliance costs; and (3) lost revenues. Because SWBT will clearly incur compliance costs, and probably lost revenues as well, the Court need not decide the question of whether or not the FCC's requirement that BOCs provide billing in-

formation to ESPs is in conflict with the PUC Rule.[8]

SWBT estimates the cost of compliance with the PUC Rule will be approximately four million dollars. This figure includes the cost of preparing and mailing ballots to customers asking them if they wish to allow SWBT to use their customer-specific CPNI to market supplemental services and/or if they wish SWBT to release their CPNI to third parties, and, if so, to which third parties; handling customer inquiries concerning the ballots; inputting the resulting data into SWBT's computer network; and adjusting computer programs so that CPNI will not automatically appear in a customer's file when personnel marketing enhanced services or receiving customer inquiries (which may lead to marketing of enhanced services) pull up a customer's file on their computer screens.

The PUC argues that a great portion of the costs described above are unnecessary and should not be considered when estimating damage. For instance, SWBT's District Manager–Residence Advertising and Marketing Communications, Michael Kelne, anticipates sending ballots to customers in separate envelopes instead of including the ballot as an insert with a customer's bill. Also envisioned by Kelne is a mass media advertising campaign to educate customers; a second balloting to increase the number of favorable responses; and enclosures in bills giving customers notice of the coming ballots.

The other primary target of the PUC's criticism is SWBT's inclusion of the cost of restricting access to CPNI, which the PUC argues is unnecessary. SWBT, in response, argues that it will be difficult, if not impossible, for SWBT personnel to not look at and consider CPNI when making a sales pitch for an enhanced service if the customer's CPNI is on the screen. SWBT further argues that only by restricting access will it be able to prove compliance with PUC Rule 23.57.

---

**8.** SWBT argues that billing information required to be given to third party ESPs includes CPNI, while the PUC maintains that billing information of ESP customers belongs to the ESPs and is not CPNI whose release is prohibited under Rule 23.57 without prior authorization.

Both SWBT and the PUC raise valid points in their arguments concerning the costs SWBT will, or should, incur as a result of Rule 23.57. Resolution of those arguments, however, is unnecessary. Even if SWBT mails only one ballot, as a bill insert; forgoes its media campaign; receives no inquiries; and simply notes on customer files the result of the ballot without barring access to CPNI, it will be forced to expend some amount of money to prepare and mail the ballot and input results into customer files. Furthermore, SWBT is arguably injured, in either case, as it will either expend more money initially or risk a low positive response rate.

In addition to these initial compliance costs, SWBT argues that it will incur revenue losses as a result of not being able to use customer-specific CPNI to market enhanced services to an estimated 95% of its customers.[9] Currently, the only enhanced service marketed by SWBT is CallNotes, a voice messaging service. SWBT does not actually provide CallNotes to its customers, but rather acts as a sales agent for SMSi, an SWBT affiliate.[10] The PUC seems to attach some importance to the fact that SWBT markets CallNotes for a separate entity, SMSi. However, as Rule 23.57 still applies, and as SWBT surely expects some economic benefit from this arrangement, implementation of Rule 23.57 would still force SWBT to incur the above-described compliance costs and injure SWBT to the extent sales of CallNotes are reduced as a result of the rule.

SWBT employs two methods to market products and services. It has a number of customer representative centers in Texas where customers can call and make inquiries and, in turn, customer representatives can suggest services or products which may benefit the customer as indicated from responses the customer makes to questions during the phone call and the customer's record on file. In addition, SWBT has two telemarketing centers in Texas, which use customer-specific, as opposed to aggregate, CPNI to market services and products. According to SWBT's District Manager–Residence Market Support in Texas, Nancy Feagin, customer representatives typically interview customers who call in and use that information to make sales, while employees in the telemarketing centers generally use customer-specific CPNI. Ms. Feagin also indicated in her deposition that the customer representative centers would be the primary sales channel for CallNotes. Thus, inability to use customer-specific CPNI would seem to have relatively little impact on SWBT's marketing of enhanced services.

Nonetheless, the Court believes SWBT's contention that revenue losses would result is valid for two reasons. First, the Court has no doubt that when a customer representative receives a phone call from a customer and pulls up that customer's file on to his or her computer screen, the representative will use that information, as well as the interview process, in determining whether or not to suggest the customer subscribe to CallNotes. If this is prohibited, and SWBT's computer system not altered to somehow block CPNI from the representative's view, it simply is incredible to this Court to expect the representative to not look at or use, at best subconsciously, information on his or her computer screen. Assuming this is possible, or the information blocked initially, the PUC insists that the representative can simply request that the customer give verbal authorization to allow the representative to use his or her CPNI; however, under Rule 23.57 such a request is only proper if the customer requests information about a supplemental service. If, for instance, a customer calls up to have a second phone line

---

**9.** SWBT estimates only a 5% response rate if two ballots are mailed and extensive advertising is done. That the response rate is indeed likely to be this low is supported by the FCC. *See Order on Remand* at 7610–11, para. 85 n. 155 ("[u]nder a prior authorization rule, a large majority of mass market customers are likely to have their CPNI restricted through inaction").

**10.** Recall that SMSi's parent corporation is Southwestern Bell Enterprises, Inc., whose parent company is Southwestern Bell Corporation, which is also SWBT's parent corporation. Put in more familiar anthropomorphic terms, SWBT is SMSi's aunt or uncle. Also recall that SMSi is not a subsidiary of SWBT or an LEC or BOC.

installed, the representative would not be allowed to inquire about use of CPNI as a second phone line is not a supplemental service. Therefore, the Court finds SWBT will suffer loss of revenue, an injury, as a result of Rule 23.57 with respect to the marketing of CallNotes.

Second, although SWBT currently plans to use customer representative centers primarily to market CallNotes, it may determine in the future that telemarketing would be more efficient and produce better results. In addition, as encouraged and expected by the FCC, SWBT may develop and market new supplemental services in the future, at which point Rule 23.57 would apply to them as well.[11] This too would cause SWBT to incur loss of revenue.

## IV. CONCLUSION

In accordance with the above opinion, the Court finds Plaintiff Southwestern Bell Telephone Company is entitled to declaratory and injunctive relief under 47 U.S.C. § 401(b) and 28 U.S.C. §§ 2201 and 2202 and enters the following orders:

IT IS ORDERED that Plaintiff's Motion for Summary Judgment, filed October 7, 1992, is GRANTED.

IT IS FURTHER ORDERED and DECLARED that subsections (e)(1), (e)(2), (e)(3), and (e)(5) of PUC Substantive Rule 23.57 are PREEMPTED BY THE FCC and that subpart (e) is VOID and has NO EFFECT, including subsection (e)(4), which is merely an exception to the remaining preempted subsections of subpart (e).

IT IS FURTHER ORDERED that the Public Utility Commission of Texas is PERMANENTLY ENJOINED from ENFORCING subpart (e) of Rule 23.57 against Southwestern Bell Telephone Company or COMPELLING Southwestern Bell Telephone Company to COMPLY with subpart (e) of Rule 23.57.

---

**11.** For that matter, SWBT may choose not to pursue development of, or market, new supplemental services in Texas because of Rule 23.57, which is also contrary to the FCC's intent as demonstrated in the Order on Remand, and which also would in effect cause SWBT to take in less revenue than they otherwise would have but for Rule 23.57.